IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-HC-2033-D

| | |
|---|---|
| TIMOTHY LEE JORDAN, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> RENOICE E. STANCIL,[1] Admin., ) <br> Bertie Correctional Institution, ) <br> ) <br> Respondent. ) | **ORDER** |

On March 6, 2009, Timothy Lee Jordan ("Jordan" or "petitioner"), a state inmate, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [D.E. 1]. Bertie Correctional Institution Administrator Renoice E. Stancil ("respondent") answered the petition [D.E. 4] and filed a motion for summary judgment [D.E. 5]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Jordan about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 8]. On November 4, 2009, Jordan moved for an extension of time [D.E. 9], which the court allowed [D.E. 10]. Jordan did not file any response to the motion, and the time for doing so has expired. As explained below, respondent's motion for summary judgment [D.E. 5] is granted.

---

[1] Jordan initially filed this action against Anthony Hathaway III as administrator of Bertie Correctional Institution. Stancil has replaced Hathaway as the administrator of Bertie Correctional Institution, and the caption reflects his automatic substitution pursuant to Fed. R. Civ. P. 25(d). In addition, the court takes judicial notice that Jordan is now incarcerated at Columbus Correctional Institution. See N.C. Dep't of Corr., Offender Pub. Info., http://webapps6.doc.state.nc.us/opi/offendersearch.do?method=view (last visited Sept. 13, 2010).

I.

The North Carolina Court of Appeals summarized the facts of this case as follows:

On 13 March 2001, Richard Allen found two men later identified as [Jordan and William Glenn Barefoot] at his airplane hangar. Allen observed that the personnel door was open and the alarm system damaged. Allen found two men inside who were wearing ski masks. Allen testified that one of the men put a .38 caliber handgun to his head and stated that he would "blow [his] f[ ] brains out." Allen was kicked in the head and tied up; had duct tape wrapped over his mouth; and was placed in the trunk of one of his vehicles. The men stole certain items of property, including Allen's black Jeep Cherokee vehicle. Before being placed in the trunk of a vehicle, Allen observed a "sideways D tattoo" on one of the men's upper arm. Law enforcement officers later discovered Allen's credit cards in the Jeep Cherokee.

Ronnie Jordan is defendant Jordan's uncle. He testified that, sometime in 2000, he tattooed a symbol that looked like "a side ways D" on defendant Jordan's upper arm.

On 30 March 2001, individuals later identified as [Jordan and Barefoot] were involved in a series of property offenses in Robeson, Hoke, and Scotland Counties. At each home, [Jordan and Barefoot] obtained entry through a door that was either kicked in or torn apart. The homes were searched for items such as guns, ammunition and electronics.

Numerous property-related offenses occurring on or about 30 March 2001 are briefly summarized as follows:

(1) The Elliot Residence – Betty Elliot noticed that someone had broken into their home. A gun, jewelry, and a heating pad were taken. The heating pad was later discovered by law enforcement in a Jeep Cherokee after a crash described in more detail below.

(2) The Carter Residence – It appeared that someone pushed a chair through glass French doors in the back of the home. No items were missing from the Carter residence.

(3) The Montgomery Residence – At approximately 10:00 a.m. on 30 March 2001, Courtney Montgomery returned home and observed a red Camaro on the side of the road and a black Jeep Cherokee in her driveway. When she heard her house alarm, Montgomery called law enforcement. As the Cherokee began to leave her residence, Montgomery followed the vehicle and observed that the license plate number began with the letters "H-X". Montgomery alerted 911 about the car's direction of travel and the tag number. A safe was missing from Montgomery's home and later recovered by law enforcement officers. The Camaro parked on the

2

road belonged to Dixie Jordan-McKinley. Agents found court papers inside the Camaro bearing the name Timothy Jordan.

(4) The Dew Residence – Joshua Dew was home alone when he heard banging at the back door of the home. He saw a man, approximately 6'2" and wearing a ski mask, kick the door in with his boots and enter with a gun. A second man entered behind him; this person was approximately the same height, but not as heavy. The second man was not wearing a mask, but had his collar pulled up to cover his face. Through a door, Dew observed the robber's dark blue or black vehicle. The man with the ski mask threatened Dew at gunpoint while the other man looted the house. The man with the mask handcuffed Dew to a chair before he and the other man left. Dew identified a ski mask, found near the location where the Jeep Cherokee later crashed, as similar to the one worn by the man who first entered his home. A Colt .38 caliber gun and jewelry box taken from the home were later found in the Cherokee.

(5) and (6) The Matthews and Sandy Residences – Firearms, jewelry, handcuffs, food, money, and other items of property were taken from the Matthews home. The door of the Sandy home was "split" and shotguns, violins, money, and other personal property were missing. A Browning .22 caliber gun and case and a Department of Corrections uniform were taken from the Matthews and were found in the Cherokee, as were two violins belonging to the Sandys.

(7) and (8) The Nadeau and Warwick Residences – Jean Nadeau's neighbor, Catherine Warwick, observed two men at Nadeau's home at approximately 10:30 a.m. on 30 March 2001. When Warwick drove to Nadeau's home to investigate, two men shot at her. Warwick thought they left in a black "van-type vehicle" that may have been a Cherokee. As the vehicle drove away, the passenger fired a gun at her again. In addition, when Warwick returned to her own house, the door was left open. Jewelry and old coins were missing.

(8) The Cabell Residence – Cabell's neighbor phoned her to inform her that her home alarm was activated. The front door was "forced in" and a Sony Playstation and other games were missing. These items were later located by law enforcement inside the Cherokee.

Raeford Police officer Ronnie McGee observed a black Jeep Cherokee traveling at high speeds approximately five miles from the Warwick residence on the morning of 30 March 2001. McGee attempted to turn around, but could not do so because of heavy traffic. At that time he was not aware of a search for the Cherokee. At 11:18 a.m., McGee responded to a dispatch regarding the breaking and enterings, and shots fired, at the Nadeau/Warwick residences. During his investigation, McGee heard radio traffic from Major Dan Skamperele of the Scotland County Sheriff's Department requesting that a tag be run on a Jeep he observed on Route 211. Skamperele then radioed that shots were being fired at him. Skamperele chased the

3

vehicle and its two occupants, later identified as [Jordan and Barefoot], at speeds as high as 90 miles per hour. During this chase, one man from the Cherokee fired shots from the sunroof of the vehicle. The driver of the Cherokee lost control of the vehicle through the parking lot of a grocery store before crashing into the door of a thrift shop. Skamperele rammed his vehicle into the back of the Cherokee, trapping it against the thrift shop door. Because of the impact, Skamperele's gun fell out of his hand and onto the ground. As he reached across the seat to retrieve his gun, the two men got out of the Cherokee. They went to Skamperele's driver side door and "screamed" at him to get out of the car. The door was jammed, but the two men managed to "rip the door open." One man grabbed Skamperele by the leg and began "pulling [him] out the door and shooting at [him]." The other man went around to the passenger side and hit Skamperele on the head. He grabbed Skamperele's gun from his hand. As Skamperele was pulled from the car, he heard one man say, "I told you to kill him." Skamperele then "saw a flash" and "felt a sting and felt his body go numb." The two men left in Skamperele's vehicle. At trial, Skamperele identified the two men as Jordan and Barefoot.

At approximately noon on 30 March 2001, Michael Parks observed the police vehicle crash into the rear of the Cherokee and the Cherokee crash into the door of a thrift shop. When he stepped outside of the store, Parks observed an officer reaching inside his car as a man descended from the top of the Cherokee and fired shots. Parks testified that Jordan was the shooter and the one originally seated on the passenger side of the Cherokee. Patricia Bullock testified. She observed the driver and passenger get out of the Cherokee at the grocery store. Both men approached Skamperele's car, opened the car door, and began firing at the officer. Bullock heard the Cherokee driver tell his passenger to "shoot him." Bullock identified Barefoot as the driver of the Cherokee and Jordan as the passenger. Stephanie Miller was leaving the grocery store when a coworker entered, pushed her back inside the door, and told her there was a shooting going on outside. Miller also identified Barefoot as the driver, but could not identify the passenger.

John Shippioto also witnessed the events involving Skamperele. He observed two men at Skamperele's driver-side window making downward motions. He then heard shots and observed one of the men come around the passenger side of the officer's vehicle carrying a handgun.

James Gregorio, co-operator of the thrift store, observed a hunter's ski mask on the ground near the Cherokee after it crashed. He gave the mask to N.C. State Bureau of Investigation (SBI) Agent Charles Newcomb. Hair was retrieved from the Cherokee; this hair was determined to belong to Jordan. Hair from the ski mask matched Barefoot's hair.

Misty Whitley testified that she heard Barefoot and Jordan tell Brian Ratley about how they had been breaking into houses on 30 March 2001 and that someone had called the police after they fired their weapons at "an old lady." They also said they

4

had "shot a cop." Plaster castings of footprints and tire prints were taken from the Elliot, Montgomery, and Nadeau residences. Tire prints around the Nadeau residence were consistent with the tire size and design on the Jeep Cherokee. The shoe impressions taken from where the Elliots' back door was kicked in measured approximately 13 to 14 inches long and were consistent with a boot. Foot prints taken from the Nadeau residence were also consistent with a size 13 boot. Bullets, fragments and casings retrieved from these crime scenes were fired from a .9 mm and a .357 or .38 caliber handgun. The bullets and fragment retrieved from Skamperele's thighs were consistent with a .38 or .357 caliber magnum type bullet.

Agent Mark Boodee, also of the SBI, collected blood samples from the Cherokee and Skamperele's police cruiser. Blood found in the front driver-side and rear passenger seats of the Cherokee belonged to Barefoot. Blood from inside of the passenger-side door of the Cherokee belonged to Jordan. Blood stains on the dashboard on the passenger side of Skamperele's car, and on a blue rag found between the two front seats, belonged to Jordan.

State v. Barefoot, No. COA06-1056, 2007 WL 1745895, *1–4 (N.C. Ct. App. June 19, 2007) (unpublished), review denied, 362 N.C. 238 (2008).

Jordan did not present any evidence at trial. Barefoot, 2007 WL 1745895, at *4. At the time of the crimes, Jordan was seventeen years old. Id. at *1. On October 14, 2002, Jordan was convicted by a jury of attempted murder, felony breaking and entering, felony speeding to elude arrest, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, assault by pointing a gun, assault with a firearm on a law enforcement officer, larceny after breaking and entering, second degree kidnaping, and assault with a deadly weapon. St. Ct. R. Vol. 1 of 6, at 384–400. The state court sentenced Jordan to 621 to 807 months' imprisonment. Jordan appealed. On June 19, 2007, the North Carolina Court of Appeals found no error. On March 6, 2008, the North Carolina Supreme Court denied review.

On March 6, 2009, Jordan filed his section 2254 petition, raising the same six claims he raised on direct appeal. Pet. ¶ 12; cf. Barefoot, 2007 WL 1745895, at *9–12. Jordan also states that he filed a "motion to locate and preserve evidence/DNA testing" in Scotland County Superior Court

5

which is still pending. Pet. ¶ 11(a).

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Congress described the standard of review for a state inmate's habeas petition, where the claims have been adjudicated on the merits in state court, in 28 U.S.C. § 2254(d). A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(1) & (2). A state-court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme

Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision "involves an unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." See id. at 407. A state-court decision also may apply Supreme Court precedent unreasonably if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.; Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc). Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

Under the doctrine of procedural default, a federal court generally is precluded from reviewing the merits of any claim that the state court found to be procedurally barred based on independent and adequate state grounds. See, e.g., Dretke v. Haley, 541 U.S. 386, 392 (2004); Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003). The doctrine also applies "when a state court also discusses the claim on its merits, e.g., in conducting a plain error review having found a procedural default." Daniels, 316 F.3d at 487. A state rule is "adequate" if it is firmly established and regularly and consistently applied by the state court. See Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not

7

depend upon a federal constitutional ruling. See, e.g., Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

However, a federal habeas court may review a procedurally defaulted claim if the petitioner demonstrates cause and prejudice as a result of the alleged violation of federal law, or that the failure to consider the federal claim will result in a fundamental miscarriage of justice. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991). To show cause, a petitioner must show that something external to him prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. See, e.g., United States v. Frady, 456 U.S. 152, 167–68 (1982).

Jordan first claims that the trial court erred in admitting, over his objection, hearsay statements that Jordan's non-testifying co-defendant made. See Pet. ¶ 12 (ground one). Jordan first raised this argument on direct appeal. See Barefoot, 2007 WL 1745895, at *9. The North Carolina Court of Appeals dismissed this claim as procedurally barred because Jordan "based his objection to the admission . . . on hearsay" rather than on any constitutional violation. Id.; cf. Bruton v. United States, 391 U.S. 123 (1968). Jordan has shown no cause or prejudice for his procedural default, and therefore the court will not consider it. See, e.g., Daniels, 316 F.3d 487.

Next, Jordan claims that the trial court erred in denying his motion to dismiss the breaking-and-entering charges for the Elliot, Sandy, Cabell, Dew, and Matthews homes. Pet. ¶ 12 (ground two). Jordan first raised this argument on direct appeal. See Barefoot, 2007 WL 1745895, at *9. The North Carolina Court of Appeals "carefully reviewed the record" and "conclude[d] that the State presented sufficient evidence to show Jordan perpetrated . . . the challenged home break-ins[.]" Id. at *9–10.

Generally, the standard of review for a claim of insufficient evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

8

of fact could find the essential elements of the crime beyond a reasonable doubt. See, e.g., Wright v. West, 505 U.S. 277, 295–97 (1992); Jackson v. Virginia, 443 U.S. 307, 319 (1979), overruled on other grounds by Schlup v. Delo, 513 U.S. 298 (1995). However, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the appropriate inquiry is "whether a state court determination that the evidence was sufficient to support a conviction was an 'objectively reasonable' application of [the standard enunciated in] Jackson." Williams v. Ozmint, 494 F.3d 478, 489 (4th Cir. 2007) (alteration in original) (quotation omitted).

In this case, there is overwhelming evidence in the record to demonstrate that Jordan committed the challenged break-ins. The perpetrators committed the crimes in a common manner all on the same day. Items taken from the specified homes were found in the Cherokee with items taken from the other homes. Jordan's blood and hair were found in the Cherokee, and eye witness testimony linked Jordan to the Cherokee. In sum, the court concludes that the North Carolina Court of Appeals' application of Jackson was objectively reasonable. Accordingly, this claim fails.

Next, Jordan claims that the trial court erred in denying his motion to dismiss one of the indictments due to a "fatal variance between [the] indictment" and the evidence in the case. Pet. ¶ 12 (ground three). The indictment alleged that petitioner assaulted "John William Schiffiano, Jr." while the evidence at trial identified the victim as "John Shippioto." Jordan first raised this argument on direct appeal. See Barefoot, 2007 WL 1745895, at *10. The North Carolina Court of Appeals dismissed the claim as procedurally barred, and, alternatively, found, "pursuant to the doctrine of idem sonans, that there was not a fatal variance" because "the victim's name as alleged in the indictment [wa]s 'sufficiently similar' to the victim's name as presented at trial, and the proof at trial matche[d] the indictment's allegations in all other respects[.]" Id. at *10–11 (citing State v. Wilson, 135 N.C. App. 504, 508, 521 S.E.2d 263, 265 (1999) ("Under the rule of idem sonans,

9

absolute accuracy in [the] spelling [of] names in legal proceedings . . . is not required."); State v. Isom, 65 N.C. App. 223, 226, 309 S.E.2d 283, 285 (1983) ("Eldred", "Elred"," and "Elton" were sufficiently similar to fall within the doctrine of idem sonans and that the variance, if any, between the indictment and the proof at trial was "wholly immaterial")). As with his first claim, Jordan has shown no cause or prejudice for the failure to preserve this issue, and therefore the court will not consider it. See, e.g., Daniels, 316 F.3d at 487.

Next, Jordan claims that the trial court erred by failing to sustain his objection to the State's closing arguments. Pet. ¶ 12 (ground four). Jordan first raised this issue on direct appeal, and the North Carolina Court of Appeals summarily dismissed it as procedurally barred on the ground that the claim "was not properly preserved for appellate review because no ruling by the trial court [on the objection] was obtained[,]" and, alternatively, because the challenged statement "was not so grossly improper as to have required the trial court to intervene ex mero motu during the State's closing argument." Barefoot, 2007 WL 1745895, at *6. Respondent contends the claim must be dismissed here because Jordan did not raise this claim before the North Carolina Supreme Court.

Under North Carolina's appellate process, direct appellate review in a criminal case includes a direct appeal to the North Carolina Court of Appeals and the opportunity to petition the North Carolina Supreme Court for discretionary review. Specifically, if a criminal defendant in North Carolina is convicted and unsuccessfully appeals to the North Carolina Court of Appeals, that person then has 15 days after the mandate issues to file an appeal or petition for discretionary review with the North Carolina Supreme Court. See N.C. R. App. P. 14. A claim that a criminal defendant fails to raise on direct appellate review is procedurally defaulted. See N.C. Gen. Stat. § 15A-1419. The procedural-default rule of section 15A-1419 is an adequate and independent state ground precluding habeas review. See, e.g., Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998). Because Jordan

10

failed to preserve this issue under North Carolina law, it is procedurally barred. See, e.g., Woodford v. Ngo, 548 U.S. 81, 92 (2006); Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). Moreover, Jordan has shown no cause or prejudice for the failure to preserve this issue, and therefore the court will not consider it. See, e.g., Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 750; Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000).

Next, Jordan claims that the trial court erred when it "tried[,] convicted and sentenced" him for both assault with a deadly weapon with intent to kill inflicting serious injury and attempted murder of Skamperele in violation of his constitutional protection against double jeopardy. Pet. ¶ 12 (ground five). Jordan first raised this issue on direct appeal. See Barefoot, 2007 WL 1745895, at *11. The North Carolina Court of Appeals denied the claim on its merits because "'each offense contains at least one element not included in the other,'" and thus did not subject petitioner to double jeopardy. Id. (quoting State v. Tirado, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004) (convictions for both attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury do not subject defendants to double jeopardy)).

The Supreme Court has long recognized that double jeopardy does not occur so long as each offense contains an essential element not required by the other. See, e.g., United States v. Dixon, 509 U.S. 688, 697–700 (1993); Blockburger v. United States, 284 U.S. 299, 304 (1932); Manokey v. Waters, 390 F.3d 767, 772 (4th Cir. 2004). Jordan has not shown that the North Carolina Court of Appeals' ruling reached a result contrary to, or involved an unreasonable application of, clearly established federal law. See, e.g., Renico, 130 S. Ct. at 1862; Manokey, 390 F.3d at 772. Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)–(e). Thus, this claim fails.

11

Case 5:09-hc-02033-D   Document 11   Filed 09/13/10   Page 11 of 12

Finally, Jordan claims that his indictment for attempted murder violates the Sixth and Fourteenth Amendments because it "did not include the elements of intent to kill or premeditation[] and deliberation." Pet. ¶ 12 (ground six). Jordan first raised this issue on direct appeal. See Barefoot, 2007 WL 1745895, at *11. The North Carolina Court of Appeals denied the claim on its merits because North Carolina law does not require that "'premeditation and deliberation . . . be separately alleged in the short-form indictment' for first degree murder." Id. (quoting State v. Braxton, 352 N.C. 158, 175, 531 S.E.2d 428, 438 (2000)).

Jordan has not shown that the North Carolina Court of Appeals' ruling on this issue reached a result contrary to, or involved an unreasonable application of, clearly established federal law. See Stroud v. Polk, 466 F.3d 291, 295 (4th Cir. 2006); Allen v. Lee, 366 F.3d 319, 323–24 (4th Cir. 2004) (en banc) (per curiam); Hartman v. Lee, 283 F.3d 190, 198–99 (4th Cir. 2002). Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)–(e). Thus, this claim fails.

III.

In sum, the court GRANTS respondent's motion for summary judgment [D.E. 5] and DISMISSES Jordan's application for a writ of habeas corpus [D.E. 1]. The court also DENIES a certificate of appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001). The Clerk of Court shall close this case.

SO ORDERED. This **13** day of September 2010.

JAMES C. DEVER III
United States District Judge